## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIMBERLY HARRIS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | Civil Action No. 11-1228<br><br>**ELECTRONICALLY FILED** |

## MEMORANDUM OPINION

**I.   INTRODUCTION**

Kimberly Harris ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  This matter comes before the Court upon Motion for Summary Judgment by Defendant.  (ECF No. 10).  The record has been developed at the administrative level.  For the following reasons, Defendant's Motion for Summary Judgment will be GRANTED.

**II.   PROCEDURAL HISTORY**

Plaintiff filed for DIB and SSI with the Social Security Administration on January 4, 2008, claiming an inability to work due to disability beginning June 30, 2006.  (R. at 137 –

152)[1].  Plaintiff was initially denied benefits on April 8, 2008.  (R. at 72 – 81).  A hearing was scheduled for April 2, 2010, and Plaintiff appeared to testify represented by counsel.  (R. at 32 – 50).  A vocational expert also testified.  (R. at 32 – 50).  The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on April 15, 2010.  (R. at 7 – 31).  Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on July 26, 2011, thereby making the decision of the ALJ the final decision of the Commissioner.  (R. at 1 – 4).

Plaintiff filed her Complaint in this Court on September 28, 2011.  (ECF No. 4).  Defendant filed his Answer on December 19, 2011.  (ECF No. 5).  Defendant's Motion for Summary Judgment followed[2].

### III.   STATEMENT OF THE CASE

In the ALJ's decision denying DIB and SSI to Plaintiff, the ALJ made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through March 31, 2010;
2. The claimant has not engaged in substantial gainful activity since June 30, 2006, the alleged onset date;
3. The claimant had the following mental diagnoses, which singularly or in combination, are severe impairments: major depressive disorder NOS, rule of bipolar disorder, postpartum depression, post-traumatic stress disorder, generalized anxiety disorder, and history of substance abuse in remission since October 2007.  However, the remaining medically determinable impairments of record are non-severe;
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, App'x 1;

---

[1]   Citations to ECF Nos. 6 – 6-12, the Record, *hereinafter*, "R. at __."

[2]   Following the filing of her Complaint (ECF No. 4), Plaintiff failed to file a Motion for Summary Judgment and supporting brief, and also failed to file any responsive briefs subsequent to the submission of Defendant's Motion for Summary Judgment (ECF No. 10).  Motions were initially due by February 2, 2012 (ECF No. 7), said deadline being extended until March 6, 2012 at Plaintiff's request (ECF Nos. 8, 9).  Despite Plaintiff's failure to submit the proper filings, the Court will still review the case as per the established summary judgment standard.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels.  However she does have non-exertional limitations due to her mental impairments and therefore she is limited to simple instructions and should avoid work in close coordination with or proximity to others; anything more than simple decision-making; avoid crowds and groups of people; avoid intensive supervision; avoid changes in the work setting; and avoid assembly line pace work;
6. The claimant is unable to perform any past relevant work;
7. The claimant was 36 years old on the alleged disability onset sate, which is defined as a younger individual age 18 – 49;
8. The claimant has at least a high school education and is able to communicate in English;
9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant had transferable job skills;
10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform; and,
11. The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2006 through the date of this decision.

(R. at 45 – 57).

## IV.    STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Schandeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).  With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  A United States District Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191(3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec'y of Health & Human Serv.*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions.  He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).  The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated

rule-making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Sec. & Exch. Comm'r v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V. DISCUSSION

Plaintiff argued that she was completely disabled from full-time work as a result of psychological impairments stemming from a car accident, rape, a series of miscarriages, and long history of substance abuse. Defendant argues that the ALJ's determination that Plaintiff was ineligible for DIB and SSI was supported by substantial evidence. (ECF No. 11). Specifically, Defendant claims that the only medical opinions which would tend to indicate that Plaintiff was disabled were undermined by reliance upon subjective complaints which were lacking in credibility. (ECF No. 11 at 8 – 13). Further, these medical opinions were allegedly both internally inconsistent and inconsistent with much of the medical record. (ECF No. 11 at 8 – 13).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ adequately met his responsibilities under the law.

As support for his decision to deny benefits to Plaintiff, the ALJ cited a number of her medical sources. The ALJ looked to Plaintiff's significant treatment history with Mercy Behavioral Health ("Mercy"). (R. at 18 – 20, 24). The earliest report from Mercy in the record shows that Plaintiff was initially seen at Mercy, on August 2, 2005, having not attended therapy at Mercy in approximately two years. (R. at 262, 273). At that time, she was noted to have acceptable/normal appearance, behavior, affect, thought content, perception, and cognition. (R. at 262). She was noted to have impaired insight, loud speech, and an anxious/angry mood. (R. at 262). Plaintiff had recently abused alcohol and drugs. (R. at 263). She alleged a recent miscarriage. (R. at 264). She wished to re-engage in treatment, however. (R. at 264). Plaintiff was diagnosed with depressive disorder, and drug and alcohol dependence. (R. at 264). Her global assessment of functional ability[3] ("GAF") score was 50. (R. at 264). She was eventually referred by Mercy for adult outpatient treatment. (R. at 265).

Plaintiff began treatment on August 11, 2005. (R. at 273). Her appearance, behavior, affect, cognition, and perception were all acceptable/within normal limits. (R. at 273). Yet, her

---

[3]   The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

speech was pressured, she was dysphoric, angry, and anxious, she was ruminating/obsessing, and her insight and judgment were impaired. (R. at 273). Her GAF score was 50. (R. at 273). Treatment continued relatively consistently for more than a year. Her GAF scores ranged between 48 and 55, trending mostly between 50 and 55. (R. at 276, 278, 281, 286, 288 – 89, 291, 293, 301, 303, 305 – 06, 309, 314, 321, 327, 329 – 30, 332, 336, 338, 341, 347). Her appearance, behavior, speech, perceptions, thoughts, cognition, and affect all tended to be acceptable/ normal. (*Id.*). Her mood, insight, and judgment tended to vacillate, however. (*Id.*). There were ups and downs with all her symptoms. (*Id.*).

Plaintiff sometimes isolated herself from others. (*Id.*). She indicated that she self-medicated with drugs and alcohol to deal with her emotional and mental issues. (*Id.*). In spite of her problems, she was capable of getting along with others, and was capable of caring for herself and performing activities of daily living. (*Id.*). By late 2005, her depression was absent/minimal, her social dependency was minimal, her anxiety was minimal, suicidal ideation was absent, and her general fear was minimal. (*Id.*). Plaintiff stated that she was feeling better in February 2006. (*Id.*). In March 2006, however, Plaintiff was reprimanded at work for being insubordinate, and she said that she wanted to be terminated. (*Id.*). She continued to struggle with substance abuse, and had significant relationship issues. (*Id.*). Yet, in April 2006, Plaintiff's anxiety and panic were mild, and her drug abuse was allegedly absent. (R. at 336).

Plaintiff was discharged from Mercy on March 14, 2007. (R. at 269). Staff noted her ongoing treatment of anxiety, depression, and substance abuse. (R. at 269). Plaintiff had attended twenty-two therapy sessions over approximately one-and-one-half years. (R. at 271). She had failed to meet her treatment goals, however. (R. at 269). Following a second miscarriage in June 2006, she was rarely seen or heard from, and had not maintained any sort of

contact since November 2006. (R. at 271, 347 – 58). When she was seen in November, she was observed to have gone through a significant psychological decline and was using cocaine daily. (R. at 347). Her case was thereafter closed. (R. at 271).

The ALJ also looked to Plaintiff's treatment record from White Deer Run/Cove Forge Behavioral Health System ("White Deer") to support his decision. (R. at 20). Plaintiff was discharged from the inpatient treatment program on November 16, 2007. (R. at 246 – 47). Plaintiff had sought help at White Deer for severe, ongoing drug and alcohol abuse. (R. at 246 – 47). Her diagnoses at discharge were crack dependence and generalized anxiety disorder ("GAD"). (R. at 246 – 47). Plaintiff was being released to Turning Point halfway house for continuing treatment. (R. at 246 – 47). However, White Deer also cleared Plaintiff to return to full activity and work/schooling at that time. (R. at 246 – 47).

Other sources relied upon by the ALJ were the reports from Plaintiff's primary care physicians Daniel Holt, M.D. and Beth Jenkins, D.O. (R. at 20 – 22, 24). At an initial session with Dr. Holt on December 3, 2007, Plaintiff was noted to be at Turning Point halfway house, and was thirty days free from cocaine use. (R. at 254). She was noted to have normal activities of daily living. (R. at 254). Similar findings were noted at visits on December 10 and 19. (R. at 248, 251). However, by December 19, 2007, Dr. Holt had noted that Plaintiff was no longer at Turning Point. (R. at 248).

Between October 12, 2008 and October 1, 2009, Dr. Jenkins indicated that Plaintiff complained of being moody, angry, unable to sleep, and "a little bit stressed." (R. at 390 – 93, 422 – 27). Plaintiff complained that she had withdrawn from a training program for paralegals due to a lack of energy. (R. at 390 – 93). Dr. Jenkins did observe some stress and some anxiety

symptoms. (R. at 390 – 93). She also noted Plaintiff's unwillingness to take medications for treatment. (R. at 390 – 93).

State agency evaluator John Rohar, Ph.D. was also cited by the ALJ. (R. at 15, 21, 371 – 74). Based upon his review of Plaintiff's medical record, Dr. Rohar diagnosed affective disorders, anxiety-related disorders, and substance addiction disorders. (R. at 371 – 74). He concluded that Plaintiff would be markedly limited in her ability to carry out detailed instructions. (R. at 371 – 74). However, in all other respects, Plaintiff was moderately to not significantly limited in her functioning. (R. at 371 – 74). In his narrative statement, Dr. Rohar opined that Plaintiff was capable of performing simple, routine, repetitive work in a stable environment, that she could make simple decisions and carry out very short, simple instructions, and that she could perform production-oriented jobs requiring little independent decision-making. (R. at 371 – 74). Dr. Rohar felt that Plaintiff was capable of working. (R. at 371 – 74). He also felt that an April 2008 functional assessment by Sharma Olfman, Ph.D. was an overstatement of Plaintiff's limitations, particularly because of heavy reliance upon Plaintiff's subjective complaints, and also because of inconsistency with the majority of Plaintiff's medical record. (R. at 371 – 74).

The ALJ noted that Dr. Olfman conducted a psychological evaluation of Plaintiff and issued a report on April 3, 2008. (R. at 14 – 16, 20 – 21, 23 – 24, 363 – 68). Dr. Olfman recounted Plaintiff's claims that her psychological problems and substance abuse emanated from a series of tragic events. (R. at 363 – 68). Plaintiff explained that it all began when she was in a severe car accident in 2005, and was raped only a few weeks later. (R. at 363 – 68). In the ensuing time, she suffered two miscarriages and lost her latest full-time job as a result. (R. at 363 – 68). Plaintiff stated that she had abused drugs and alcohol until October 2007. (R. at 363

– 68). At that time, Plaintiff had entered a drug treatment program at White Deer for approximately one month. (R. at 363 – 68). Following some time in halfway homes, Plaintiff returned to live with her parents and struggled to remain sober. (R. at 363 – 68). Plaintiff alleged continuing to seek treatment, but refused to take prescription medications for her issues due to fear of new addictions. (R. at 363 – 68). Plaintiff complained of depression, moodiness, difficulty sleeping, drug urges, anger, and inability to concentrate. (R. at 363 – 68). Plaintiff had continuously held full-time jobs until her second miscarriage in 2006. (R. at 363 – 68).

Dr. Olfman's observations largely paralleled Plaintiff's complaints, although Plaintiff was found to be alert and oriented, was able to express herself clearly, could engage in abstract thinking, had intact memory, had intact social judgment, sufficient insight, and expressed some self-serving behaviors. (R. at 363 – 68). Plaintiff was capable of shopping, cooking, driving, paying bills, maintaining a residence, personal grooming, and interacting with authority figures, co-workers, peers, and the public. (R. at 363 – 68). Dr. Olfman diagnosed postpartum depression and post-traumatic stress disorder. (R. at 363 – 68). Plaintiff was in need of intensive therapy. (R. at 363 – 68). Difficulties with anger and depression would limit her ability to carry out complex tasks, follow a schedule, sustain a routine, make decisions, perform at a consistent pace, maintain attendance, or cope with distress. (R. at 363 – 68). Despite earlier findings, Dr. Olfman also indicated that Plaintiff would have marked difficulty interacting with supervisors. (R. at 363 – 68).

The ALJ also noted that Plaintiff was seen somewhat regularly by psychologist Lawrence Haddad, Ph.D. in late 2009 and early 2010. (R. at 14 – 16, 21 – 25, 414 – 17). Dr. Haddad completed two functional assessments of Plaintiff during that time. The first occurred on November 5, 2009. (R. at 396 – 401). At that time, Dr. Haddad diagnosed major depression.

11

(R. at 396 – 401). Plaintiff was not taking any medication for treatment. (R. at 396 – 401). While Plaintiff was noted to have a number of behavioral limitations, she had no limitations in performing activities of daily living. (R. at 396 – 401). Plaintiff also had no difficulties with social functioning. (R. at 396 – 401). Plaintiff was noted to have significant difficulty with concentrating. (R. at 396 – 401). His prognosis was guarded. (R. at 396 – 401). He indicated that Plaintiff would have marked difficulty carrying out detailed instructions. (R. at 396 – 401). In spite of earlier findings, he also found Plaintiff would have marked difficulty interacting with the public. (R. at 396 – 401). He felt that Plaintiff would have difficulty responding appropriately to pressure in the usual work setting. (R. at 396 – 401). Plaintiff's substance abuse was "in good remission." (R. at 396 – 401).

    Dr. Haddad completed a second assessment in March 2010. (R. at 418 – 21). At that time he diagnosed Plaintiff with mood disorder, depression, and possibly bipolar disorder. (R. at 418 – 21). Plaintiff's substance abuse was still in "good remission." (R. at 418 – 21). Her GAF score was only 38. (R. at 418 – 21). However, over the past year, her highest score had been 58. (R. at 418 – 21). His prognosis was still guarded. (R. at 418 – 21). While Plaintiff had good intellectual functioning, she was believed to likely miss at least four days of work per month. (R. at 418 – 21). Further, Plaintiff was not believed to be malingering, and her past substance abuse did not contribute to her limitations. (R. at 418 – 21). She was found to be seriously limited or completely unable to remember work-like procedures, carry out short, simple instructions, maintain regular attendance, sustain an ordinary routine, work in coordination with or proximity to others, complete a normal workday/workweek, perform at a consistent pace, get along with co-workers and peers, deal with normal work stress, understand, remember, or carry out detailed instructions, set goals and make plans, deal with the stress of semi-skilled and skilled work,

interact with the public, maintain socially appropriate behavior, and travel in unfamiliar places. (R. at 418 – 21).

The ALJ afforded Drs. Olfman and Haddad's assessments limited weight, however. (R. at 14 – 16, 20 – 25). As Defendant and the ALJ correctly pointed out, these reports contained numerous inconsistencies both internally and with the remainder of the less severe evidence of record, and relied upon subjective complaints lacking in credibility. (R. at 14 – 16, 20 – 25). Also, Plaintiff had always been noted in the record to be fully capable of engaging in activities of daily living. She was the primary caretaker for her young child. As discussed by the ALJ, these facts weighed heavily against Plaintiff.

Moreover, while Plaintiff last worked full-time in June 2006, until an undeniably tragic miscarriage and leave of absence from work ultimately cost Plaintiff her job, the ALJ took note that Plaintiff subsequently managed to engage in two full semesters of training to become a paralegal. (R. at 21, 36, 38). This clearly undermined Plaintiff's contention that she could not work because of mental issues resulting from the above mentioned events. The ALJ also learned that Plaintiff had actually been working during the period following her car accident and date rape – for approximately four or five years – even though she claimed that those two events were the genesis of her downward spiral into drug and alcohol abuse. (R. at 18, 41). Plaintiff's credibility was understandably eroded by the fact that she misinformed her treating sources, and the ALJ at her administrative hearing, regarding the date of her car accident and date rape. (R. at 18, 41). While Plaintiff generally claimed that her car accident occurred in 2005 and her date rape occurred several weeks later, records from Mercy dated July 29, 2005, documented the car accident as having occurred in 2000, and the rape in 2001. (R. at 257).

These facts, in conjunction with White Deer's conclusion that Plaintiff could return to work, Dr. Rohar's similar conclusion, and other evidence of record illustrating that Plaintiff's activities of daily living were unlimited – diminishing Plaintiff's credibility regarding her functional limitations, this Court concludes that the ALJ supported his decision with substantial evidence.

## VI. CONCLUSION

Based upon the foregoing, the Court finds that the ALJ adequately justified his decision not to find Plaintiff eligible for DIB or SSI. Accordingly, Defendant's Motion for Summary Judgment will be granted, and the decision of the ALJ will be affirmed. An appropriate Order follows.

*/s Arthur J. Schwab*
Arthur J. Schwab
United States District Judge

cc/ecf: All counsel of record.